## COLBURN *v.* RAILROAD.

## (*Knoxville.* November 8, 1894.)

1. COUNTY COURT. *Jurisdiction over public bridges.*

   County Court has exclusive and final jurisdiction to determine the necessity, utility, and propriety of building a public bridge, and to fix time and place of its erection. The action of the County Court, in this regard, cannot be revised or enjoined by the Chancery Court. (*Post, p. 48.*)

2. SAME. *Authority to issue negotiable bonds.*

   County Court has not authority, in the absence of statute expressly conferring it, to issue negotiable bonds of the county for any purpose whatever. (*Post, pp. 49-53.*)

   Cases cited and approved: 111 U. S., 400; 15 Wall., 566.

   Cited and disapproved: State *v.* Anderson County, 8 Bax., 249.

3. SAME. *Contract for public bridge unauthorized, when.*

   A contract between a county and a railroad company, entered into without the assent required by the Constitution of a three fourths majority of the people expressed at an election held, pursuant to law, for that purpose, is unauthorized and void, which provides that, in consideration of a stipulated sum to be paid by the county, the railroad company shall build a combined railway, wagon, and foot bridge over a stream for its own and the public use, and that the railroad company shall forever keep the bridge in repair, and shall construct certain lines of railway, and shall concede to the county the fee in certain portions of the right of way. and also for the public benefit, the use of its track by other companies, and special freight rates for particular products. By such a contract, the county becomes, in violation of the Constitution, a stockholder with the railroad company, and loans its credit to the railroad enterprise. (*Post, pp. 52-56.*)

---
Colburn v. Railroad.
---

Constitution construed: Art. II., § 29.
Act construed: Acts 1885, Ch. 149.

---

FROM HAMILTON.

---

Appeal from Chancery Court of Hamilton County.
W. L. EAKIN, Sp. J.

SHEPHERD & FRIERSON for Colburn.

T. D. YOUNG, WM. H. DEWITT, THOMAS & ELDER for Railroad.

WILKES, J.   This is an injunction bill, brought by two taxpayers of Hamilton County, to enjoin the delivery to the railroad company of certain bonds of the county issued to secure the building of a free wagon and foot bridge across the Tennessee River at Chattanooga, and to have the bonds declared void and canceled.

The defendants, county of Hamilton and Chattanooga Western Railroad Company, demurred to the bill, and, on hearing, Special Chancellor W. L. Eakin overruled the demurrer, and made the injunction perpetual; but in the exercise of his discretion under the statute, granted an appeal, which was taken, and the county and railroad company have assigned errors.

The facts, so far as necessary to be stated, are that, at the July term, 1893, of the Quarterly Court of Hamilton County, the defendant railroad company made a proposition to the Court, looking to joint action and co-operation in building a combined railway, wagon, and foot bridge across the Tennessee River, from Chattanooga to the west bank of the river, at what is known as Moccasin Bend. This proposition the Court rejected, but, in lieu, took action as follows:

The Court, by resolution, determined and resolved (reciting that it was a county purpose, and in the discretion, judgment, and opinion of the Court, to the best interests of the county and the public welfare) that it, for county purposes, would build a wagon and foot bridge between the points mentioned.

The resolution further recited that the cost of the bridge would exceed the amount which could be realized from special taxation during the period covered by its erection, and that, in order to build and pay for the same, it would be necessary for the county to issue $150,000 of its bonds, bearing five (5) per cent. interest, and running twenty years to maturity, of the denomination of $1,000 each, and to be sold at not less than par.

The Court thereupon resolved, in substance, that if the defendant railroad company would, (1) in connection with its road and branches, construct a railroad bridge between the termini mentioned; (2) as a

part of said railroad bridge, and above the same, construct for the county, and for county purposes, a free wagon and foot bridge; (3) make the bridge abutments and approaches of size and strength, and according to plans approved by the county; (4) vest in the county the fee simple, unincumbered title to the railroad right of way, one hundred feet in width, for the distance of one mile from the north end of the bridge; (5) begin the work within six months, and finish it within three years, including a main line from Chattanooga to Middle Creek, and a branch from Middle Creek to the crest of Walden's Ridge, twenty-five miles distant from Chattanooga; and a branch from the end of the bridge, along the north side of the river, to a connection with the Cincinnati Southern Railroad; (6) guarantee to continually maintain the foundation, piers, and other substructures of the bridge, so as to keep the county's wagon and footway thereon safe, secure, and unimpaired; (7) allow any other railway to use the bridge and five miles of the defendant's railroad track, of main line, and (8) would carry, and require all other roads using the bridge to carry, all coal and coke, from any point on the line, within twenty-five miles of Chattanooga, to any point in the city, or suburbs, at a freight rate of not more than twenty-five cents per ton; then, when all these conditions shall be agreed to by the railroad company, the county would issue $150,000 of its bonds, and place the same in the First National Bank of the city

within ninety days after the proposition of the county
was accepted, to be delivered to the railroad company
only when the bridge and lines of railway are fully
completed, and the conditions of the contract met,
and the bridge paid for by the railroad company,
and properly tested, and, when so delivered, to be
in full payment and satisfaction for the construction
of the said free wagon and foot bridge built for the
county, the railroad company to have an easement
over the strips of land, vested under the agreement
in the county, so long as the contract provisions
were complied with by the railroad company, but not
longer.

It was further resolved, that the contract instrument
should be registered, and its conditions and provisions
run with the road and bridge and right of way into
whatever hands they might thereafter pass.

On the same day that this resolution was passed,
the railroad company, in open Court, accepted its
provisions in writing, and the Court thereupon passed
a resolution authorizing the issuance of the bonds,
and their delivery to the bank, and the County
Judge and bridge committee were authorized and
directed to see to the erection, on the top of the
railroad bridge, of the wagon and foot bridge pro-
vided for in the resolutions and agreement.

The demurrer to the bill proceeds upon the idea,
among others of less importance, first, that the con-
tract thus entered into constituted a giving or loan-
ing of the credit of the county to the railroad with-

out submitting the same to a vote of the people of the county, contrary to the spirit and letter of the Constitution; second, that it was an effort on the part of the county, without such election being held, to become a stockholder with the railroad company in the bridge and right of way; third, that there was no public necessity for the bridge; fourth, that there was no public road to the bridge on either side of the river; fifth, that it was beyond the power of the county to be the joint owner in such manner of the bridge.

For defendants it is argued that such contract is authorized by and in conformity with the Constitution and general laws of the land; that the Chancery Court has no jurisdiction to inquire into the necessity, utility, or propriety of building a bridge, or its location, or time of erection, or as to the levy of taxes to pay for the same, because all these matters are exclusively in the discretion of the County Court; that the contract is not prohibited by any statute, or the Constitution, and the acts relied on to sustain the contract are constitutional, and the contract is not one giving or loaning the credit of the county to a railway, or becoming a stockholder therein.

Whether the arrangement proposed to be entered into by the county is a judicious one, and for the best interest of the county, is not for this Court to inquire, but the question with us is simply one of authority to do what the county proposes to do, in the way it is attempting to do it.

We think we need not consider many of the points raised and so ably argued by opposing counsel. We have been greatly aided by the very lucid, able, and exhaustive arguments made upon the points of law involved in the cause. The Constitution of 1870, as well as that of 1834, provides that the General Assembly should encourage a well-regulated system of internal improvements, in order to develop the resources of the State and promote the happiness and prosperity of its citizens.

That the Legislature has authorized the several County Courts to build jails, courthouses, and bridges in certain events, and raise money to pay for the same, will not be questioned. This necessarily presupposes the power to contract a debt for such purposes; and it is insisted that the right to create a debt carries with it, by necessary implication, the right to issue an evidence of that debt. This is, to a certain extent, conceded, for the county may, without doubt, issue its warrant on the County Trustee to meet the debts and demands against its treasury. But it is denied that this right extends to the issuance of bonds or commercial evidences of debt.

The case of *State* v. *Anderson County*, 8 Bax., 249, is referred to as holding "that a county, like any other corporation having a right to create a debt, has also the incidental right to issue the commercial evidence of it, in such form as may be satisfactory to the parties." It is true this lan-

4—10 P

guage is used in the opinion in that case, but as a general statement not really involved in the decision of the question before the Court.

In that case, the question of the subscription upon which the bonds issued had been submitted to a vote of the people, and the real question at issue was, whether the submission was according to the statutes, and the controversy was between the county and an innocent holder of the bonds after an acquiescence of sixteen years in their validity by the county, and the payment of interest upon them. The effect of ratification by the county, and an estoppel against it, were the controlling features of that case.

The mode of payment for bridges is expressly fixed by statute (M. & V. Code 1453), such payment to be made out of taxes annually assessed and collected by the County Trustee, and kept separate and subject to and paid out on the order of the Court, and the amount of such tax is limited by § 1452 to the same amount in any year as the State tax for that year. Special Acts have been and may be passed, authorizing counties to issue bonds to pay for bridges, courthouses, jails, etc., when these are the only objects to which the bonds are to be devoted. The exact question of authority in the county to issue bonds, in the absence of such a special statute, came before the Supreme Court of the United States in the case of *Claiborne County* v. *Brook*, 111 U. S. Rep., 400, a case arising under the general

statutes of our State, and that Court held "that counties are for the purpose of local police and administration, and that they have no power or authority to make or utter commercial paper of any kind, unless it is expressly conferred upon them by law, or clearly implied from some other power expressly given, which cannot be fairly exercised without it." It was further held that, under the Code of Tennessee, contracts may be made by counties for the erection or repair of public buildings, and the power to issue vouchers for payment is necessarily implied, but no power is given, or can be implied, to issue bonds, or other commercial paper having the privileges and exemptions accorded to that class of commercial securities.

And, again, in the case of *Police Jury* v. *Britten*, 15 Wall., 566, the same Court says: "It is one thing for County Trustees to have the power to incur obligations for work actually done in behalf of the county, and to give proper vouchers therefor, and a totally different thing to have the power of issuing unimpeachable paper obligations, which may be multiplied to an indefinite extent. If it be conceded that counties have an implied power to issue coupon bonds payable at a future day, which may be valid and binding obligations in the hands of innocent purchasers, there will be no end to the frauds that will be perpetrated."

We are clearly of opinion that this is sound law, and that the county of Hamilton, *under the*

*general statutes* of the State, had no express or im-
plied authority to issue the bonds proposed to be
issued by them in this instance.

But defendants claim that the county had such right
under the provisions of an Act of the General As-
sembly of 1893, Chapter 116. This Act is special,
and applies to Hamilton County, and was no doubt
passed to enable the county to undertake some such
contract as is involved in this case.

The Act provides, in substance, that the County
Court of Hamilton County may join, and co-operate
with any individual, firm, joint stock company, or cor-
poration, in the construction of a combined foot,
wagon, and railroad bridge or bridges, across any
navigable stream within the county, and may appro-
priate and contribute, on such terms and conditions
as they deem proper, not to exceed $150,000, and
that, in order to raise the amount, the County Court
might issue the bonds of the county, and provide
for their payment, as authorized by the Act, not to
exceed $150,000, and not to bear greater rate of
interest than five per cent., or run longer than fifty
years to maturity. The Act does not require the
question to be submitted to a vote of the people of
the county. It is said this Act is unconstitutional,
because it seeks to extend the credit of the county
of Hamilton in aid of the railroad company, without
the assent of the citizens of the county by a three
fourths vote, and because it seeks to make the county
a stockholder in the bridge and right of way with

the railroad company. Both the third and fourth sections of this Act refer to the action authorized by it as "*granting the aid of the county.*" This aid must consist in the bonds of the county, which is but another name for the credit of the county, for it has no money in its treasury.

It is possible that this action might be made constitutional by submitting it to a vote of the people, but this is clearly not the intention of the Act, and the bill in this cause charges that a motion to submit the action of the Court to a vote was made in the County Court and rejected, and no election has ever been held.

The language of the Constitution is: "The credit of no county, city, or town shall be given or loaned to or in aid of any person, company, association, or corporation, except upon an election to be first held by the qualified voters of such county, city, or town, and the assent of three fourths of the votes cast at such election; nor shall such county, city, or town become stockholders with others in any company, association, or corporation, except upon a like election, and the assent of a like majority."

It is evident that the letter and spirit of this provision is that the county shall not be a stockholder nor joint owner with any company, association, or corporation in any enterprise or improvement, although it may be one in which the county may be otherwise authorized to enter.

We think it apparent that, under their contract,

the county of Hamilton does loan its credit to the railroad company to enable it to build this bridge, and that it does become a stockholder or joint owner with the railroad company in the ownership of the bridge and right of way.

There is nothing to indicate that the $150,000 of bonds is the cost of the superstructure or wagon way, as separate from the substructure or railway, nor can the former exist without the latter, and the right of the county extends to the foundation and substructure, at least to the extent of an easement, for support and maintenance.

It is not simply the case of the railroad company building the bridge, as the agent of the county and for the county, to be paid for by the county after it is built, but they are engaged in a joint enterprise, and the aid of the county is extended to the railroad, to enable it to consummate the enterprise, by issuing its bonds as a basis of credit for the enterprise. *Garland* v. *The Board, etc.*, 6 So. Rep., 442 (Ala.).

Not only is this so, but the county does become concerned in the matter far beyond its mere interest in the building of the county bridge. This joint agreement contemplates not only the building of the bridge for both railroad and county purposes, but the building of twenty-five to fifty miles of railroad branches, in order to reach coal and iron mines, stone quarries, timber, and the main line of the Cincinnati Southern Railroad Company, and one of

the stipulations is, that the fee simple title to the land covered by the railroad company's right of way for one mile north of the bridge (but not the bridge itself) is to vest in Hamilton County.   There is also a stipulation that other railroads may use the railroad bridge, and that coal shall be brought into Chattanooga and its suburbs at a special rate.   All of these matters form a part of the consideration for this contract, and the county becomes, to a greater or less extent, interested in them all with the railroad, and it is probable that, but for this aid from the county, the additional roads and other improvements would not be undertaken by the defendant road; and it further appears, from the bill, that ample bridge facilities already exist at or near this same location, so that the building of a county bridge is not the primary object in view.

If we are correct in our construction of this agreement between the county and the railroad, that it is not merely a contract to build a bridge for the county, to be used for county purposes and belong to the county, but that it is a lending of credit to the railroad, and becoming a stockholder and joint owner with the railroad company in the proposed improvements, then we need not consider the Act of 1885, Chapter 149, to which we have been referred, at all, for it relates exclusively to the building of county bridges in certain localities, not in connection with any railroad enterprise, and under its provisions will be found no authority to

loan credit to any company, association, or corporation, or to become jointly interested with such companies.

We need not, therefore, consider whether the latter Act is constitutional or unconstitutional, as, under our construction of the contract in this case, the contemplated issue of bonds would not be authorized by that Act, whether it be constitutional or not.

We are of opinion, that under a proper construction of this contract, or agreement, between the county of Hamilton and the railroad company, the issuance and delivery of the bonds, as proposed, is contrary to the Constitution in the absence of any submission of the proposition to the people of the county, and the decree of the Special Chancellor sustaining the demurrer was correct, and the same is affirmed.

The county of Hamilton and the defendant, First National Bank of Chattanooga, are perpetually enjoined from delivering said bonds to the defendant railroad company, or otherwise negotiating them, and the bonds are canceled, and will be delivered up for destruction.

The county of Hamilton and the railroad company will pay the costs of this Court and the Court below, equally.